UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JAMES VENTRY,

                        Petitioner,

                                                 DECISION AND ORDER
       v.                                             04-CV-0341A
                                                     01-CR-028A

UNITED STATES OF AMERICA,

                        Respondent.

## INTRODUCTION

Defendant James Ventry was convicted of one count of witness tampering in violation of 18 U.S.C. § 1512(b)(1). After unsuccessfully appealing his conviction, the defendant moved to vacate his conviction asserting that trial counsel was ineffective because he suffered from an actual conflict of interest. This Court denied the motion to vacate. On appeal, the United States Court of Appeals for the Second Circuit found that the record did not support this Court's determination that no conflict existed. Accordingly, the Second Circuit remanded for an evidentiary hearing on the conflict issue.

An evidentiary hearing was held on June 30, 2009. Post-hearing briefs were filed and the matter was deemed submitted. For the reasons stated, the Court finds that Ventry has failed to show an actual conflict of interest that

adversely affected counsel's performance. Accordingly, the motion to vacate is denied.

## BACKGROUND

**A.   Basis for Ventry's Witness Tampering Conviction**

On August 1, 1996, three masked intruders attempted a home invasion robbery at the Niagara Falls, New York residence of Michael Palmeri. Palmeri was a bookmaker, and during the attempted robbery the intruders exhibited a belief that he had a substantial amount of cash generated by his bookmaking activities hidden in the house. Upon entering the house, the intruders encountered Palmeri's wife, Colleen Palmeri, and proceeded to hold her at gunpoint for about 55 minutes while they demanded money from her and ransacked the house looking for the bookmaking proceeds they believed were there. Throughout the entire course of the attempted robbery, the Palmeri's five children were asleep in the house, four in the basement, and one in the upstairs bedroom. Eventually the robbers gave up and left empty-handed.

An investigation into the robbery led the government to suspect Ventry and two others, Wared Abdellatif and Robert Vitagliano. Ventry was called to testify before a federal grand jury on September 7, 2000. After his grand jury appearance, Ventry told his then-fiancée Christine Janik about his role in the robbery.

Janik was subsequently interviewed by Federal Bureau of Investigation ("FBI") Special Agent Robert Utz on February 5, 2001. Janik told Utz about Ventry's September 7, 2000 confession to his role in the robbery. Utz reduced this to a written

statement, which Janik signed.  After Utz left, Janik called Ventry to tell him that she had just spoken with the FBI and had told the agent the truth.  Ventry immediately came to Janik's residence where he and Janik had a confrontation.  Janik ended the confrontation by telling Ventry that she never wanted to see him again.

That night, Ventry called attorney Thomas Eoannou on his cell phone.  As will be discussed in detail below, Ventry had not retained Eoannou or any attorney at that time.

On February 6, 2001, the day after speaking to Eoannou, Ventry sent Janik an e-mail that read as follows:

> Chrissy, I just want you to know that I spoke to a lawyer last night and they said that if you made that statement under deress that they can not hold you to that and that's all you have to do is call Anthony Bruce who is the prosecutor and tell him that the statement was made under deress and that it is not true and that is what you will say if they make you tetsifie in front of a Grand Jury. You should get a lawyer to make the call but if you can't just call yourself. He said it is absolutely legal to do and they can not get you in any trouble for it no matter what they say. Anthony Bruce's number is 221-4811 ext. 886. They have not one bit of physical evidence or
>
> Bobby would be arrested for something other than threatening a witness. Also when and if you go to the Grand Jury you can remain silent after you change your statement. Listen I know you hate me but I am a very good person and I know you don't want me to go to jail. But I want you to know that if you do this that my lawyer will have to try and destroy your reputation and I will have to tell him everything *[including private embarrassing information about you]*.[1]  Now I know your thinking I hate this asshole but believe me I love you more than anything and it would break my heart to ever have to do something like that but I can not fo to jail for something I did not do. I'm really sorry for having to say those things to you, I know I've hurt you enough, but I will have no choice. I don't think you understand I can go jail for 13 years and when I get my life will be over. I will be 40 years old, no job, no chance of ever getting married or having kids. So please call him today, I know you were trying to protect

---

[1]  Redacted to omit the specific embarrassing information Ventry threatened to disclose.

3

> me and yourself but its not to late that statement is not binding. Take care
> of yourself and again I am sorry for saying those things to you. Love
> always, james

(spelling, grammatical errors and paragraph break as in original e-mail).

On February 16, 2001, an indictment was returned charging Ventry, Abdellatif and Vitigliano with conspiracy and attempted robbery in violation of the Hobbs Act, 18 U.S.C. § 1951 and using a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). Additionally, the indictment charged Ventry with making false declarations before the grand jury, in violation of 18 U.S.C. § 1623; and tampering with a witness, in violation of 18 U.S.C. § 1512(b)(1).

The witness tampering charge was based upon Ventry's e-mail to Janik. It was the government's theory at trial that Ventry sent Janik the e-mail in order to coerce her to withdraw her statement to Agent Utz. Janik testified that if she had done so, she would have been lying because her statement to Agent Utz was the truth.

The defense theory was that Janik's statement to Utz was untrue, and that it was given under duress because Janik was worried she would be arrested if she did not give that statement. During trial, Ventry's attorney, Anthony Lana, got Janik to admit on cross-examination that she made her statement under duress and only after Agent Utz yelled and screamed at her and threatened to arrest her and charge her as an accomplice. She testified that she was scared and that she felt compelled to give Utz that statement. She also stated that Agent Utz provided some of details about the robbery that she included in her statement.

After eliciting that testimony, Lana argued to the jury in his closing that Janik's statement was untrue, that Ventry never confessed, and that Janik felt compelled to

give that statement to Utz to save herself.  Lana argued that in sending the e-mail, Ventry was merely trying to convince Janik to tell the truth.  With regard to Ventry's threat to disclose Janik's personal secrets, Lana argued that Ventry, a non-lawyer, was merely speculating as to what he thought would happen at trial if she refused to do so.

Ventry was found guilty of the witness tampering charge, but acquitted on all charges.  He was sentenced principally to 48 months in prison.  His conviction was affirmed on appeal.

**B.   Motion to Vacate**

In his motion to vacate, Ventry argues that his attorney, Anthony Lana, suffered from an actual conflict of interest during trial due to his relationship with attorney Eoannou.  As noted above, Ventry initially sought legal advice from Eoannou concerning Janik's statement to Agent Utz.  During pretrial proceedings, Eoannou (who initially represented Ventry's co-defendant, Wared Abdellatif) admitted speaking to Ventry and providing some advice.  Ventry argues that Eoannou should have been called as a defense witness to explain that he (Eoannou) advised Ventry to tell Janik to contact the Assistant United States Attorney ("AUSA") and change her statement. Ventry claims that Lana's failure to call Eoannou to support an advice-of-counsel defense was due to an actual conflict between the two attorneys.

Ventry asserts that Lana and Eoannou were law partners, as evidenced by their use of the firm name "Eoannou, Lana & D'amico," their shared office space and other public representations of partnership.  Ventry argues that since Lana and Eoannou were partners, Lana failed to call Eoannou as a witness in order to avoid exposing his

5

partner to potential misconduct allegations. If he and Eoannou were actually partners, as their firm letterhead suggested, Lana should have called Eoannou as a witness at trial to explain that it was Eoannou who had advised Ventry to contact Janik. Lana's failure to do so stemmed from his desire to avoid implicating his partner in the witness tampering charge. Alternatively, if Lana and Eoannou were not actually partners, as they claimed in pretrial proceedings before this Court, then calling Eoannou as a witness might have exposed both himself and Eoannou to potential misconduct charges stemming from their improper representations of a law partnership in the absence of one.

This Court initially denied Ventry's motion to vacate based on the Lana-Eoannou conflict finding that "there was no conflict of interest" because "Lana and Eoannou are not in the same law firm." On appeal, the Second Circuit remanded for further development of the record. The Circuit Court noted that the record was silent as to why Lana had failed to call Eoannou as a defense witness. The Circuit Court further noted that, during pretrial proceedings, Eoannou had volunteered to testify on Ventry's behalf and was in the best position to support a defense theory that Ventry was simply acting on the advice of counsel in sending the e-mail to Janik. Given that, the Second Circuit pondered:

> if nothing precluded Eoannou from testifying on Ventry's behalf, why did Lana not call Eoannou as a witness? Eoannou, after all, was the individual who could best support the defense Lana employed at trial. Eoannou, furthermore, had vociferously pronounced his eagerness for his advice to Ventry to be presented to the jury. Could Lana's decision not to call Eoannou have arisen from Lana's relationship with Eoannou? If so, this might raise grave conflict concerns.

See Ventry v. United States, 539 U.S. 102, 112 (2d Cir. 2008). The Circuit Court was understandably concerned that one possible basis for not calling Eoannou was that doing so would put both attorneys "between the proverbial 'rock and a hard place.'" Id. at 115. The Circuit Court judiciously noted:

> Perhaps Lana was concerned that, by calling Eoannou as a defense witness, the government, in cross-examination, would have forced Eoannou to choose between two equally unpalatable options: (1) admitting to public misrepresentations of a partnership relationship with Lana and thereby exposing himself-and Lana-to professional misconduct charges; or (2) admitting to a lack of candor in failing to inform the court of Eoannou's partnership relationship with Lana.

Id. Accordingly, the Circuit Court remanded for further development of the record as to what the nature of the relationship between the two attorneys was, and whether that relationship played any role in Lana's decision to forego calling Eoannou as a witness.

C.     **Hearing after Remand**

Following remand, this Court held a hearing to develop the record. Both Eoannou and Lana testified at the hearing. Ventry did not testify. No other witnesses were called.

Eoannou testified that he has been practicing law since 1983. Since at least 1993, his entire practice has been criminal defense work. In 1993, he hired Anthony Lana as an associate to work with him in his criminal defense practice. Lana worked for Eoannou for about three years. During that same period, another attorney named Michael D'Amico also joined Eoannou's firm, and the firm became known as Eoannou, Lana and D'Amico.

Sometime in 1996, Lana left Eoannou's employ and became a sole practitioner.

When he left, Lana decided to set up his practice in a building owned by Eoannou located at 484 Delaware Avenue, Buffalo, New York. Lana is one of several attorneys who rent office space from Eoannou in that building. Eoannou's law office is on the first floor, Lana's is on the second.

Eoannou testified that his relationship with Lana since 1996 has been strictly a landlord/tenant business relationship, not a law partnership. Like other attorneys in the building, Lana pays Eoannou a rental fee that covers rent and utilities. Lana and other attorneys share other office-related expenses, such as a photocopier, telephone services, postage, and office supplies. When Lana or another attorney in the building incurs a long distance telephone call expense, postage expense, uses office supplies or makes photocopies, the attorney uses a billing code specific to that attorney and later reimburses Eoannou for those expenses. Lana and Eoannou also share expenses for the cost of a receptionist who is located in the lobby of that building, and for secretarial services.

Although the attorneys share general office expenses, they maintain separate offices. Lana's office is located on a different floor from Eoannou. Both Lana and Eoannou lock their offices and neither has a key to the other attorney's office. The attorneys keep their own separate files locked in their offices. Each attorney has his own password-protected computer in his office that only he can access. The attorneys maintain their own separate bank and IOLA accounts and there is no commingling of funds. The attorneys represent their clients individually. Neither attorney has ever

appeared for the other attorney to address a substantive motion or proceeding.[2] Eoannou also emphasized that he and Lana advise their clients that they are not part of the same firm. Eoannou represents his own clients, and Lana represents Lana's clients. In contrast, Eoannou employs an attorney named Jeremy Schwartz. Eoannou pays Schwartz's salary and all of Schwartz's expenses. Eoannou and Schwartz represent clients together, and each has substituted for the other to address substantive motions and proceedings.

Eoannou admitted that he and Lana used letterhead and signed pleadings with the caption "Eoannou, Lana & D'Amico." That practice began when Lana and D'Amico worked for Eoannou. However, after they left his employ, the three attorneys continued to use the Eoannou, Lana & D'Amico name. He stated that he did not believe doing so was impermissible because he, Lana and D'Amico had always advised their clients that they were not part of a firm. The attorneys no longer refer to themselves as Eoannou, Lana & D'Amico.

With regard to the telephone call from Ventry on the night of February 5, 2001, Eoannou testified that Ventry called Eoannou on Eoannou's cell phone and asked for Eoannou. It is not clear how Ventry got that telephone number. Eoannou was in his office, Lana was not in Eoannou's office. However, Ventry's co-defendant, Wared Abdellatif may have been in the office at the time, or had just left Eoannou's office after

---

[2] Occasionally, Lana and Eoannou have appeared for one another to "stand in" for a scheduling conference, as they have for other criminal defense attorneys in Buffalo. It is common practice for a defense attorney in a multi-defendant case to "stand in" for another attorney for simple status conferences or scheduling conferences if that attorney is not available.

9

retaining Eoannou to represent him.

Ventry told Eoannou that his fiancée had been interviewed by Agent Utz and given a statement that may have been coerced. At some point during that conversation, Eoannou realized that Ventry's case was related to Abdellatif's case. Eoannou told Ventry to contact a lawyer[3] and have that lawyer call the AUSA to advise him that the statement may have been coerced. Eoannou steadfastly denied telling Ventry to contact the AUSA directly, or to re-contact his fiancée. In fact, Eoannou specifically recalled telling Ventry *not* to contact his fiancée. He also said that he has been a practicing attorney for over 25 years and that he "always tell[s] defendants not to contact the witness because that is fraught with peril." Eoannou admitted that he may have given Ventry the telephone number of the AUSA, because he knew who it was and knew the number by heart, but he did so only as a courtesy to Ventry for Ventry to provide the number to a lawyer. He did not intend for Ventry to contact the AUSA directly.

Attorney Anthony Lana also testified at the hearing. Lana confirmed that he and Eoannou have not worked in the same firm since 1996, when Lana left Eoannou's employ to become a sole practitioner. Lana explained that he is merely Eoannou's tenant, that he pays rent to Eoannou, shares a secretary, receptionist, telephone service and office supplies, but that since 1996 he has never had a joint account or commingled funds with Eoannou.

When asked about the letterhead and pleadings, Lana explained that he and

---

[3] Lana had not yet been retained to represent Ventry.

Eoannou (and presumably D'Amico) shared a secretary and continued to use the Eoannou, Lana and D'Amico name simply out of convenience. Like Eoannou, he did not believe it was improper to do so because both attorneys made clear to their clients that they were sole practitioners. Lana testified that he did not intend to hold himself out as Eoannou's partner by using that name.

Lana recalled that his first contact with Ventry occurred at Ventry's arraignment on February 7, 2001. He had been retained earlier that morning by Ventry's father to represent Ventry on the Hobbs Act robbery charges. Lana did not even know about the Janik e-mail until Ventry was rearrested a week or so after the initial arraignment and charged with witness tampering.[4] As soon as Lana learned about the e-mail, he contacted Eoannou and asked whether Eoannou advised Ventry to send it. Consistent with his testimony at the hearing, Eoannou admitted speaking to Ventry and telling him to get a lawyer to contact the AUSA to address potential duress, but denied telling Ventry to contact Janik or to threaten exposing her personal secrets if she didn't change her statement.

Lana also testified about his decision to not call Eoannou as a witness on Ventry's behalf. Lana explained that in order to assert an "advice-of-counsel" defense, Ventry needed to testify first and state that he sent the e-mail based upon legal advice provided by Eoannou. That was problematic for two reasons. First, Lana thought the risks of having Ventry testify on his own behalf outweighed the benefit of asserting the advice-of-counsel defense. Ventry had testified before the grand jury and Lana knew

---

[4] Ventry's initial arrest was based only on the Hobbs Act robbery charges and did not include witness tampering.

that his grand jury statements would be fodder for cross-examination if Ventry were to testify. During his grand jury testimony, Ventry evidently admitted that he had been stopped by police in a vehicle with his co-defendants shortly after the robbery. Lana recalled that Ventry was pulled over "in a vehicle with two of the other charged co-defendants in very close proximity, I believe a block away from the scene of the crime, and within five to ten minutes of the 911 call." (See Hearing Transcript, Dkt. No. 326, at 88). That fact had not been introduced during the trial, and Lana expressed concern that if it were to come in through Ventry's cross-examination, it would be "huge problem" for the defense because it would place Ventry near the scene of the robbery with his co-defendants. One of those co-defendants, Robert Vitigliano, had admitted to the robbery and testified against Ventry and Abdellatif at trial.

The second reason Lana did not want Ventry to testify is because he felt Ventry's testimony about relying on Eoannou's advice would be undermined by Eoannou's testimony. Although Eoannou would have acknowledged telling Ventry that "if" there had been duress, he should call a lawyer and have that lawyer contact the AUSA, Lana knew that Eoannou had also denied telling Ventry to threaten Janik with exposing personal secrets if she failed to do that.[5] Therefore, in Lana's view, testimony by Ventry and/or Eoannou would have undermined an advice-of-counsel defense.

For the same reason, Lana did not think that calling only Eoannou (without Ventry) would have helped the defense. Lana knew that, if called, not only might

---

[5] Lana was present during the June 19, 2002 proceeding when Eoannou told this Court that he had nothing to do with paragraph two of Ventry's e-mail, that those were "his [Ventry's] own comments." Eoannou also opined that Ventry's comments "[were] not even legally sound." (See Tr. of June 19, 2002 hearing, Dkt. 253, at 28-29).

Eoannou deny telling Ventry to send the e-mail, he may have testified to the opposite - that he specifically told Ventry *not* to contact Janik, a prosecution witness.[6] Lana also knew that Eoannou would have denied (as he had in Court on June 19, 2002) telling Ventry that Janik's personal secretes would be exposed at trial. In fact, Lana feared that on cross-examination Eoannou may have been forced to acknowledge that he would never do so because he knew that such information was inadmissible. By not calling Eoannou, Lana was still able to assert to the jury that Ventry sent the e-mail innocently to persuade Janik to tell the truth, without risking potentially adverse testimony Eoannou.

The Court found both Lana and Eoannou to be credible witnesses. Their testimony was consistent with one another. Additionally, Eoannou's version of the telephone conversation with Ventry was consistent with his earlier representations as to what he told Ventry. Ventry did not testify to offer a different version of the telephone conversation.

---

[6] Lana was present during the detention hearing on February 16, 2001, when the AUSA told the court that he had spoken to Eoannou about the e-mail and Eoannou told him (the AUSA) that "[Eoannou] believes he told Mr. Ventry . . . not to talk to the witness," although the AUSA did stated that Eoannou was "a little bit equivocal" on the issue. (See Tr. of February 16, 2001 Detention Hrg., Dkt. 108, at 7).

**DISCUSSION**

The Second Circuit remanded this matter so that this Court could determine: (1) the nature of the relationship between Lana and Eoannou; and (2) whether that relationship influenced Lana's decision not to call Eoannou as a defense witness.

**1.     Nature of the Relationship**

With regard to the first question, the Court credits Lana's and Eoannou's testimony that there was no partnership relationship during Lana's representation of Ventry.  Both attorneys repeatedly denied the existence of any partnership relationship since 1996.  The evidence shows that both attorneys were, at the time, each acting as sole practitioners who shared office space and certain mutual office expenses.  Neither had access to the other's files, computer, bank accounts or clients. They did not share fees.  Neither attorney had provided advice to the other's client,[7] nor had either appeared on behalf of the other's client for a substantive court proceeding.

There is no conflict of interest merely because attorneys share office space and resources.  See United States v. Badalamente, 507 F.2d 12, 20-21 (2d Cir.1974), cert. denied, 421 U.S. 911 (1975) (finding no conflict where record showed that attorneys shared office space and secretary, but interests did not overlap in acceptance of clients or sharing of fees); United States v. Bell, 506 F.2d 207, 224-25 (D.C. Cir. 1974) (finding no conflict where evidence disclosed that attorneys shared office space but practiced

---

[7] Of course, the exception is the advice provided by Eoannou to Ventry on February 5, 2001, but that advice was provided before Lana was retained to represent Ventry.

independently). "Shared space and resources is relatively common among solo practitioners." Rivas v. United States, No. 96 CV 2954 (SJ), 1997 WL 391464 (E.D.N.Y. Jul. 8, 1997) (finding no conflict where attorneys shared office space and a secretary).

Although not partners, Lana and Eoannou are friends and colleagues, and Eoannou is Lana's landlord.

### 2. Did that Relationship Influence Lana's Representation of Ventry?

Lana testified that his friendship with Eoannou and Eoannou's role as his landlord played no role in his decision to refrain from calling Eoannou as a witness at trial. Instead, Lana decided not to call Eoannou because he believed Eoannou's testimony would harm more than help the defense theory. As noted above, Lana explained that he did not call Eoannou because he knew that Eoannou might acknowledge telling Ventry *not* to contact Janik, a government witness. Lana also knew that Eoannou would deny any knowledge of the latter part of the e-mail wherein Ventry threatens to expose Janik's personal secrets if she did not retract her statement to Agent Utz. Eoannou had previously told this Court that the latter part of the e-mail reflected Ventry's "own comments" and were "not even legally sound." (See June 19, 2002 hearing, Dkt. 253, at 28-29). Lana recognized the possibility that Eoannou might be forced to admit on cross-examination that he would never give such advice because he knew Janik's personal secrets would be inadmissible. That was exactly the testimony Eoannou gave at the hearing. Lana recognized that a jury, like this Court, may have found Eoannou to be a credible witness, thereby implicating rather than

15

exonerating Ventry. Thus, despite the fact that Eoannou would acknowledged speaking to Ventry about possible duress by Agent Utz, his denial of other portions of the e-mail and his testimony that he told Ventry not to contact Janik would have been more harmful than beneficial to the defense. Lana also knew that he could not put Ventry on the stand to contradict Eoannou because having Ventry testify created other serious risks to the defense.

Moreover, Lana did not view Eoannou's testimony as crucial to the defense theory. It was the defense theory that Ventry did not intend to persuade Janik to give a false statement. Rather, he was trying to persuade her to retract the false and coerced statement that she had already given, and to tell the truth. Even without Eoannou's testimony, Lana was able to present that theory to the jury, supported by: (1) Janik's own testimony that she made her statement under duress because she felt forced to do so by Agent Utz; (3) Janik's testimony that Agent Utz fed her details about the robbery that she included in her statement; and (4) Ventry's own words in the e-mail wherein he denied committing the robbery. If the jury had believed that Ventry was merely trying to persuade Janik to tell the truth, that was a complete defense to the witness tampering charge. Indeed, the Court instructed the jury that their verdict should be not guilty if they found that Ventry's intention was merely to encourage Janik to testify truthfully. Thus, rather than call Eoannou to present an advice-of-counsel defense, Lana asserted the defense that Ventry lacked the mental state necessary to commit the crime. A defense counsel's decision not to call a particular witness ordinarily falls withing the realm of trial strategy that courts are reluctant to disturb. See Eze v. Senkowski, 321 F.3d 110, 129 (2d Cir. 2003).

On the other hand, the decision not to call a witness "must be grounded in some strategy that advances the client's interests." Id. If trial counsel fails to call a witness in order to save himself work, id., or as is alleged in this case, to save himself or his fellow attorney from disciplinary scrutiny, that would amount to ineffective assistance because the decision to forego testimony would not have been motivated by a strategy that advances the client's interests. Ventry claims that Eoannou was not called because doing so would have: (1) implicated Eoannou as a participant in witness tampering; and (2) subjected Lana and Eoannou to potential disciplinary proceedings based upon their use of the "Eoannou, Lana & D'Amico" name.[8]

The Court rejects that argument for several reasons. First, the Court found Lana's explanation for not calling Eoannou to be credible for the reasons stated above. Second, calling Eoannou would not have implicated him as a participant in witness tampering.[9] On the contrary, it would have highlighted that Ventry acted on his own and out of desperation when attempting to coerce Janik to change her testimony. Third, it

---

[8] Ventry asserts that use of the Eoannou, Lana & D'Amico name ran afoul of then-applicable disciplinary rules prohibiting a lawyer from practicing "under a trade name, a name that is misleading as to the identity of the lawyer or lawyers practicing under such name, or a firm name containing names other than those of one or more of the lawyers in the firm." See 22 N.Y.C.R.R. § 1200.6(a)[DR 2-102(b)]; see also id. at §1200.7(c) [DR 2-102(c)](prohibiting a lawyer from "hold[ing] himself out as having a partnership with one or more other lawyers unless they are in fact partners."). Effective April 1, 2009, New York replaced its existing Disciplinary Rules with the New York Rules of Professional Conduct. However, the relevant portions remain unchanged in the new Rules. See Rule 7.5(b) an (c).

[9] Eoannou denied telling Ventry to contact Janik or to send her an e-mail threatening to reveal personal secrets if she failed to retract her statements to Agent Utz. Eoannou's version of the telephone conversation was credible and uncontradicted by any testimony from Ventry. It was also consistent with Eoannou's recitation of that conversation during earlier court proceedings in June 2002. Since Eoannou did not counsel Ventry to commit witness tampering, calling him as a witness would not have implicated Eoannou in that crime.

does not appear that Eoannou or Lana recognized the ethical concerns raised by their use of the "Eoannou, Lana & D'Amico" name.  Therefore, in the Court's view, it played no role in Lana's decision to refrain from calling Eoannou.

With regard to the latter, point, whether use of the Eoannou, Lana & D'Amico name *in fact* violated the attorneys' ethical obligations is a matter more appropriately addressed by the attorney grievance committee.  For the purposes of Ventry's motion, what matters is whether Lana and Eoannou *believed* it improper at the time, so as to provide an alternative reason for Lana's decision to avoid having Eoannou testify. Throughout the hearing, the attorneys maintained that they did not believe that use of the Eoannou, Lana & D'Amico name misrepresented their relationship as a partnership. In their view, there could be no misrepresentation of a partner relationship because they explicitly advised their clients that the two were merely sole practitioners who shared office space.  They also noted that, in cases where they represented co-defendants, judges in this District routinely conducted a hearing wherein the nature of their relationship as sole practitioners who share office space was disclosed.[10]  Given

---

[10]  This Court made reference to those proceedings in its June 19, 2002 inquiry into the potential conflict issue.  The Court stated:

> Mr. Lana, I don't have such a problem with you, and I don't have a real problem with the - *we've had this thing about the two of you sharing office space. I'm not so concerned about that*.  That doesn't - *we've done this many times*, and I obviously will have to go into it more on the record as to why.

(See Tr. of June 19, 2002 hearing, Dkt. 253, at 25)(emphasis added).  The emphasized portions refer to the fact that the Court had, in *other* proceedings where both Lana and Eoannou sought to represent co-defendants, made clear to those co-defendants that Lana and Eoannou were attorneys who shared office space and elicited a *Curcio*-type waiver from those defendants in order to permit both attorneys to remain on the case representing co-defendants. If Eoannou had been permitted to remain on the case, the Court would have again done so. When Eoannou withdrew his representation of Abdellatif, the Court mistakenly believed the

18

that both they and the courts routinely advised their clients as to the nature of their relationship, neither attorney considered use of the joint letterhead as creating a misrepresentation of a law partnership. The Court believes that if they had recognized that use of the Eoannou, Lana and D'Amico name raised ethical concerns, they would have simply stopped using the name.[11]

In the end, Lana made a reasonable, strategic decision to avoid having Eoannou testify and undermine the defense theory. Without Eoannou's testimony, the defense was able to assert that Ventry's e-mail was merely an innocent attempt to persuade Janik to tell the truth. That theory was also consistent with the overall defense that Ventry did not participate in the robbery. If Eoannou had gotten on the stand and acknowledged telling Ventry *not* to contact his Janik, or told the jury that he never suggested that Janik's personal secrets would be exposed at trail, that testimony would have undermined Ventry's claim of acting innocently. Because Lana's decision to not call Eoannou had nothing to do with their relationship or their use of the Eoannou, Lana & D'Amico name, Ventry cannot establish that the asserted conflict "adversely affected [Lana's] performance." See United States v. Schwartz, 283 F.3d 76, 91 (2d Cir. 2002) (holding that, to establish a Sixth Amendment violation, petitioner must show "an actual conflict of interest that . . . adversely affected his counsel's performance.").

---

conflict issue had been resolved. At the time this Court, like Eoannou and Lana, failed to appreciate the potential ethical concerns raised by the attorneys' use of the Eoannou, Lana & D'Amico name.

[11] Following remand from the Second Circuit, they did just that. The attorneys no longer use the name "Eoannou, Lana and D'Amico" and now refer to themselves as "The Law Office of Thomas Eoannou" and "The Law Office of Anthony Lana," respectively.

**CONCLUSION**

For the reasons stated, the Court finds that Lana did not provide ineffective assistance of counsel because his reason for not calling Eoannou as a witness was based upon a strategic decision and not the result of the relationship or the potential misconduct charges that may have arisen if Eoannou had testified. Accordingly, Ventry's § 2255 motion is denied. The Clerk of Court is hereby ordered to enter judgment in favor of the United States and take all steps necessary to close the case.

SO ORDERED.

*s/ Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

DATED: June 22, 2011